WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Joel Leon Thomas, et al.,<br><br>　　　　　　Defendants. | No. CR-12-00523-002-PHX-DGC<br><br>**ORDER** |

Defendant Joel Thomas has filed four motions: a motion to suppress evidence (Doc. 300), a motion in limine to preclude evidence (Doc. 268), a motion to sever (Doc. 253), and a motion for a bill of particulars (Doc. 299). The government has responded to all four motions. Docs. 260, 276, 313, 314. Defendant has filed a reply to the government's response to the motion to suppress. Doc. 343. The Court held an evidentiary hearing on November 27, 2013 on the motion to suppress. For the following reason, the Court will deny the motion to suppress, deny in part and grant in part the motion to preclude evidence, deny the motion to sever, and deny the motion for a bill of particulars.

**I.    Motion to Suppress**

Defendant has moved to suppress evidence seized from his cell phone and statements he made during an interview with law enforcement officers on February 29, 2013. Doc. 300. The factual findings that follow are based on evidence presented during the evidentiary hearing.

**A.     Factual Findings.**

On the morning of February 29, 2012, Eric Carlin, who was a bank manager, and Defendant Joel Thomas, who was a bank teller, arrived at the Chase Bank at 9790 W. Peoria Road in Peoria, Arizona, to open the bank. Carlin entered the bank while Defendant stayed in his car in the parking lot, per bank policy. After Carlin signaled to Defendant that all was clear, Defendant left his car and walked toward the bank. Defendant told investigators that, as he approached the door of the bank, an individual standing at the ATM ("suspect") approached him, lifted his sweatshirt, and showed Defendant a handgun. Defendant entered the bank and the suspect tried to follow him through the door. Carlin tried to close the door, but the suspect pushed it open, pulled out a black handgun, and pointed it at Carlin.

Upon entering the bank, the suspect directed Carlin and Defendant to the vault and ordered them to open the doors. The suspect demanded that Carlin and Defendant fill bags with money from the main vault and the teller drawers. He then ordered Carlin and Defendant lie on the floor of the bathroom and left the bank. Once Carlin realized the suspect was gone, he used his cell phone to call 911. The suspect escaped with approximately $240,000. The indictment in this case alleges that the suspect was Billy Wane Brymer, III, and that Defendant helped him plan and execute the robbery.

At 7:40 a.m., Peoria Police Officer Cameron Lebbon, who happened to be in a parking lot near the bank, responded to Carlin's 911 call. Upon arriving, Officer Lebbon encountered Carlin and Defendant. Officer Lebbon took initial statements from both employees. He also said they could make a phone call to family or friends to report they were safe, but asked them not to speak to each other.

Peoria Police Detective Jeffrey Balson arrived on the scene around 8:15 a.m., and FBI Special Agent Lance Leising arrived shortly thereafter. Officer Lebbon gave a short briefing to law enforcement at the scene. Following Officer Lebbon's briefing, Peoria detectives also briefed the team regarding an on-going bank fraud investigation in which Defendant was a suspect.

1   During this time, Officer Lebbon noticed that Defendant was repeatedly texting on his cell phone. Officer Lebbon testified that he was concerned that Defendant may be sharing information with others about the bank robbery. Detective Balson testified that he too noticed Defendant texting or "manipulating his phone with his fingers" and was concerned that he might be deleting information or sharing communications with someone about the robbery. Detective Balson directed Officer Lebbon to make sure that Defendant and Carlin were not using their phones, and, if necessary, to confiscate the phones. Officer Lebbon ultimately approached Carlin and Defendant and requested their phones. Carlin relinquished his phone, as did Defendant after turning it off. Neither Carlin nor Defendant expressed reluctance.

At 9:57 a.m., Detective Balson and Special Agent Leising interviewed Mr. Carlin. The interview took place inside a Peoria Police Department crime truck that had arrived at the scene. The crime truck, referred to by officers as the "bread truck," is a mobile police unit, smaller than a semi-truck and larger than a passenger van. The truck is accessed through doors at the back or through the driver's side or passenger doors. The truck is divided into two compartments, with seats and a camera in the back compartment for interviews.

Carlin's interview lasted approximately one hour. Carlin was not read his *Miranda* rights. Detective Balson and Agent Leising testified that Carlin's emotional state was consistent with someone who had been robbed at gunpoint, and his story of what happened was consistent with what was known about the robbery. Carlin's phone was returned to him at the end of the interview.

Defendant's interview began at 11:24 a.m. and also occurred in the crime truck with Agent Leising and Detective Balson. Defendant was not read his *Miranda* rights. Balson testified that he does not read *Miranda* rights to victims of crime, and that when Defendant's interview began, he was viewed as a victim, not a suspect.

Leising and Balson were not in uniform during the interview, but they were armed. Their weapons were not drawn in Defendant's presence. Defendant was not

- 3 -

handcuffed, the door to the truck was closed but not locked, and the truck was parked in the bank parking lot. The interview was recorded, and the Court has carefully reviewed a transcript of the interview that was admitted in evidence during the hearing.[1]

At the beginning of the interview, the officers acknowledged that Defendant had been the victim of a robbery and asked how he was doing. Defendant said he was anxious, but able to proceed. Defendant told the officers that he was a criminal justice major, that he understood what they were doing, and that he knew witnesses could be "bad" and wanted to do his best for them. Defendant seemed anxious to tell his story, saying "I want to start with when I first got to the bank." Ex. 9 at 5.

The interview began by Defendant recounting what happened that morning. As the officers began to ask more detailed questions, however, Defendant's answers became inconsistent and vague. For example, when Defendant first said that the robber lifted his sweatshirt to reveal a handgun as Defendant approached the door of the bank, Defendant said he did not think much of it – "I mean, it's Arizona. It's kind of like the wild, wild west." "[S]o I thought, whatever." *Id.* at 27-28. Later, Defendant said he "felt like paralyzed" and thought "just get inside, just get inside" as he was approached by the robber. *Id.* at 31. In addition, Defendant's description of the robber was vague and inconsistent. Defendant said the robber wore a ski mask, then said he did not, said he had the hood of his sweatshirt pulled up, then said he did not, and generally was unable to provide details about the robber's appearance. Defendant also failed to provide a clear explanation as to why he proceeded to enter the bank as he was being approached by a person displaying a gun.

At page 34 of the 150-page interview transcript, Agent Leising says that he does not think Defendant is being honest. By about page 80, the officers clearly are suspicious of Defendant's answers, and begin to say so. They ask Defendant if he is

---

[1] The Court will cite to the transcript as Exhibit 9 admitted during the hearing, but asks that the government place a copy in the docket by filing it with a notice of filing. This will ensure that the transcript is available for review on appeal.

- 4 -

willing to take a lie detector test, and he says no. *Id.* at 82, 86-87, 108. They suggest that Defendant is not acting like a "true victim," that the decisions he makes in the truck could affect the rest of his life, and that this is his opportunity to tell the truth. *Id.* at 86-93. They ask for consent to review the contents of Defendant's cell phone, and he says no. *Id.* at 120-22.

Although Defendant states at times that he feels uncomfortable, he repeatedly expresses a willingness to be interviewed. *Id.* at 34, 81, 112. For example, this exchange occurs at page 112:

> MR. LEISING: The questions we ask are hard.
>
> MR. THOMAS: So it's like – can I get this over with? Can I go home to my sister, pick her up?
>
> MR. LEISING: At some point – I mean, you're not arrested at all.
>
> MR. THOMAS: Right.
>
> MR. LEISING: At some point you're going to get to go home.
>
> MR. THOMAS: Right. Of course, I'm not arrested. And I'm here on my own free will. I could just get up and leave.
>
> MR. LEISING: Yeah.
>
> MR. THOMAS: But I don't want to. So, I'm like, what more do you need from me, other than, you know, if you're –

During the last one-third of the interview, the officers become more accusatory, suggesting that Defendant knows more than he is telling and specifically knows the identity of the robber. *Id.* at 98-110, 124-128. Defendant protests that he does not know more, at times states that he is uncomfortable and feels like a suspect, and ultimately elects to terminate the interview. *Id.* at 112, 122, 125, 135, 138, 149.

After the interview, officers obtained warrants to search Defendant's home, car, and cell phone, and to conduct surveillance. Doc. 313 at 10. The searches found three

firearms, including a black 9 mm semi-automatic pistol, which the government argues matches the description given by Mr. Carlin for the firearm used during the robbery, and a Smith & Wesson .380 caliber pistol in Defendant's car which is the same make and model as a firearm used at another robbery linked to Defendant. Doc. 268. In Defendant's phone, detectives found text messages between Defendant and Billy Wane Brymer, III, the individual accused of robbing Defendant and Carlin on February 29, 2012. Doc. 313 at 12.

### B. Analysis.

#### 1. Seizure of cell phone.

Defendant asserts that Officer Lebbon's seizure of his cell phone was unlawful. Doc. 300. The government argues that Defendant consented to the seizure and that the officers' actions were reasonable to prevent a witness from communicating with anyone about the bank robbery before he had been interviewed. Doc. 313.

The Fourth Amendment prohibits unreasonable searches and seizures. To safeguard this right, police should obtain judicial approval prior to seizure of personal property. *Katz v. United States*, 389 U.S. 347, 357 (1967) ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions"). A warrant is not required, however, when an individual voluntarily consents to a search, *Florida v. Royer*, 460 U.S. 491 (1983), or when exigent circumstances such as the imminent destruction of evidence justify a warrantless search, *Kentucky v. King,* 131 S. Ct. 1849, 1858, 179 L. Ed. 2d 865 (2011).

The government bears the burden of demonstrating that any consent to a search or seizure was voluntary, and "must show that there was no duress or coercion, express or implied, and that the consent was unequivocal and specific and freely and intelligently given." *United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000) (internal quotes omitted). Courts look to the totality of the circumstances to determine

1  whether consent to a search or seizure is voluntary and examine factors including:
2  (1) whether the person was in custody; (2) whether the officers had their guns drawn;
3  (3) whether a *Miranda* warning had been given; (4) whether the person was told that he
4  had the right not to consent; and (5) whether the person was told that a search warrant
5  could be obtained. *Id*.

6        A person is in custody if the person has been "deprived of his freedom of action
7  in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Defendant
8  was not physically restrained when Officer Lebbon asked for his phone.  He was
9  standing outside the bank and had been given permission to communicate with family
10 and friends to assure them he was safe.  Officer Lebbon did not have his gun drawn,
11 no *Miranda* warning had been given because Defendant was not in custody, and
12 Defendant was not threatened with a search warrant if he refused to relinquish the
13 phone.  Although Defendant was not informed that he had the right not to consent, it
14 appears he understood this fact.  Defendant later emphasized his criminal justice
15 training and refused requests by officers to take a lie detector test or consent to a search
16 of the phone.  The Court concludes that Defendant's surrender of the phone was
17 voluntary.

18       Additionally, the concern of law enforcement officers that Defendant might be
19 communicating with others about the bank robbery or destroying evidence on his phone
20 constituted exigent circumstances sufficient to warrant a temporary confiscation of the
21 phone.  A well-recognized exception to the warrant requirement applies when "the
22 exigencies of the situation make the needs of law enforcement so compelling that [a]
23 warrantless search is objectively reasonable under the Fourth Amendment." *King*, 131
24 S. Ct. at 1856 (citing *Mincey v. Arizona,* 437 U.S. 385, 394 (1978)).  Tampering with
25 or destroying evidence clearly can constitute such an exigency. *King*, 131 at 1856;
26 *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *Ker v. California,* 374 U.S.
27 23, 40 (1963).

28       The Court concludes that Defendant's surrender of the phone was voluntary and

justified by exigent circumstances. No Fourth Amendment violation occurred when Officer Lebbon requested and obtained the phone. As noted above, law enforcement officers obtained a search warrant before reviewing the contents of the phone.[2]

**2.     Statements made during interview.**

Defendant argues that statements made during his interview violated his *Miranda* rights because he was in custody and not given a *Miranda* warning. The government asserts that Defendant's interview was non-custodial. After considering the relevant factors, the Court agrees with the government.

A suspect is considered "in custody" for purposes of *Miranda* "if the suspect has been 'deprived of his freedom of action in any significant way.'" *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (quoting *Miranda,* 384 U.S. at 444). "To determine whether the suspect was in custody, we first examine the totality of the circumstances surrounding the interrogation. We then ask whether a reasonable person in those circumstances would have felt he or she was not at liberty to terminate the interrogation and leave." *Craighead*, 539 F.3d at 1082 (citations and quotations omitted).

In *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002), the Ninth Circuit identified five non-exclusive factors to consider in assessing whether a suspect is in custody: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. The Court will consider these factors and additional relevant facts.

First, Defendant was not summoned to the interview in a manner that would suggest he was in custody. Officers Leising and Balson testified that Defendant was

---

[2] Although not challenged by Defendant, the Court finds that officers retained the phone for a reasonable period of time before obtaining a search warrant. Detective Balson testified that officers sought a warrant after they had completed their work at the bank on February 29, 2012, and obtained it by 6:19 p.m. that day.

interviewed as a victim witness, just as the bank manager had been. Defendant was present during the robbery and clearly would have understood the need for officers to interview him about the event. Moreover, it is objectively reasonable for law enforcement officers to interview witnesses to a bank robbery promptly after the crime has occurred, as was explained to Defendant before the interview. This factor weighs against a finding of custodial interrogation.

Second, officers Leising and Balson generally did not confront Defendant with evidence of his guilt. They asked for his version of events and followed up with detailed questions. They stated several times that they viewed him as a victim. Ex. 9 at 2, 30, 83. Although they eventually began to doubt his statements and told him so, they did not produce evidence of his guilt. For example, they did not mention that they knew he was under investigation for bank fraud. This factor weighs against a finding of custody.

Third, Defendant was interviewed in the bank parking lot, but in physical surroundings in the back of the truck that clearly were confined. This factor weighs in favor of finding a custodial interrogation.

Fourth, Defendant's interview lasted almost two hours. The bank manager's interview lasted one hour. The length of the interview was justified by the level of detail covered and Defendant's evasive and inconsistent answers. *See* Ex. 9. When compared with other cases that have considered this factor, the Court concludes that it does not weigh in favor of custodial interrogation. *See, e.g., United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) (finding that a two and a half hour interrogation was non-custodial); *Kim*, 292 F.3d at 981 (finding that a 90 minute detention for questioning was non-custodial).

Fifth, there was no significant pressure applied to detain Defendant during the interview. Although his physical surroundings were enclosed, he was never handcuffed or physically restrained. As noted above, Defendant indicated several times that he wished to continue the interview. Ex. 9 at 34, 81. The officers told

1  Defendant that he was being interviewed as a victim, and appear to have held this view
2  throughout the first half of the interview. *Id.* at 2, 30, 83. Although they did not tell
3  Defendant at the beginning of the interview that he was free to leave, they did tell him
4  during the course of the interview that he could decline a lie detector test (*id.* at 82),
5  that he would be given the officer's contact information when he left the interview (*id.*
6  at 107), and that he was free to leave (*id.* at 122, 149). Defendant acknowledged his
7  understanding that he was free to leave at any time, but stated that he wished to
8  continue. *Id.* at 112. Perhaps most importantly, Defendant ultimately terminated the
9  interview and left the crime truck. *Id.* at 150. The fifth factor weighs against a
10 custodial interrogation.

11 In addition to the five *Kim* factors, Defendant's behavior confirms that he was
12 not in custody. While the test is an objective one, evidence of Defendant's actions can
13 also be relevant. Defendant expressed his understanding and belief that the police
14 could not detain him and that he was free to leave, refused the officers' request that he
15 take a polygraph test, refused to consent to a search of his cell phone, and ultimately
16 left the interview. These actions suggest that Defendant was indeed free to decline the
17 officers' requests and make his own decisions.

18 In sum, four of the five *Kim* factors favor a finding that the interview was non-
19 custodial, and Defendant's actions during the interview confirm this finding. Because
20 the interview was not custodial, the officers were not required to give a *Miranda*
21 warning and the motion to suppress will be denied.

22 **II.   Motion in Limine**

23 Defendant has moved to preclude evidence of his other crimes and acts,
24 including participation in an alleged bank fraud and evidence of his possession of three
25 firearms found in his home and car. Doc. 268. The government does not intend to
26 introduce evidence of Defendant's participation in the bank fraud, but will seek to
27 introduce such evidence should a need arise. Doc. 276. If the government concludes
28 that evidence of the bank fraud is relevant and admissible, it shall raise the issue with

the Court and defense counsel outside the hearing of the jury.

The government argues that evidence of Defendant's possession of the firearms is relevant and admissible. *Id*. At issue are a black 9 mm semi-automatic pistol matching the description of the firearm used in the third robbery and a Smith & Wesson .380 caliber pistol of the same make and model used in the first robbery. Doc. 268. The government also wishes to introduce evidence of a third gun found in Defendant's possession which does not match any of the guns used in the robberies.

Federal Rule of Evidence 403 precludes the admission of evidence if its probative value is substantially outweighed by a danger of unfair prejudice. *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000). Unfair prejudice means "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*.

Evidence of the Smith & Wesson .380 caliber pistol is relevant. It shows that Defendant owned a gun that matched the gun used by his co-defendant in the first bank robbery. Defendant argues that his ownership of a firearm could unfairly prejudice his defense, but the Court does not agree. Gun ownership is lawful and widely accepted in Arizona. Although some people may disfavor ownership of handguns, this issue can be addressed in voir dire and jury instructions. The Court cannot conclude that the risk of unfair prejudice substantially outweighs the relevancy of this gun.

The 9 mm semi-automatic pistol also has probative value. It matches the description of the firearm used in third bank robbery that was never found. Again, the Court cannot conclude that the risk of unfair prejudice from evidence of this gun substantially outweighs its probative value.

The third firearm does not match the make and model of any firearm used in the three bank robberies. The government argues that evidence of this firearm is relevant to show that Defendant had access to guns, but his general access to guns is not an issue in this case. The Court finds that evidence of this third gun has no relevance and therefore is not admissible.

/ / /

### III. Motion for Bill of Particulars

Under Federal Rule of Criminal Procedure 7(f), the Court may direct the government to file a bill of particulars if Defendant moves for one within 14 days after arraignment. Typically, "[a] motion for a bill of particulars is appropriate where a defendant requires clarification in order to prepare a defense." *United States v. Long,* 706 F.2d 1044, 1054 (9th Cir.1983). Such an order is inappropriate, however, if an indictment "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and enables the Defendant to plead acquittal or conviction. *United States v. Chenaur,* 552 F.2d 294, 301 (9th Cir.1977). While statutory language in an indictment "must be accompanied with such a statement of facts and circumstances as will inform the accused of the specific offense," *id.*, a defendant "is not entitled to know all the *evidence* the government intends to produce, but only the *theory* of the government's case," *United States v. Ryland,* 806 F.2d 941, 942 (9th Cir.1986) (emphasis in original).

The Court finds the indictment sufficient to apprise Defendant of the charges filed against him, to enable him to prepare for trial, to avoid surprise, and to plead acquittal or conviction. *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979). Defendant also conceded at the suppression hearing that discovery has cleared up any ambiguity in the indictment. The motion for a bill of particulars is denied.

### IV. Motion to Sever

Defendant asks the Court to sever the charges relating to the two bank robberies where he was not physically present from the charge relating to the February 29, 2012 robbery. Doc. 253. Defendant argues that there is scant evidence against him for the first two robberies, and that he is likely to be convicted of those two crimes based on evidence derived from the third robbery.

Rule 14 allows the Court to order separate trials of counts if joinder would prejudice a defendant or the government. To obtain severance, however, Defendant

carries the heavy burden of showing "clear, manifest, or undue prejudice from a joint trial." *United States v. Smith*, 893 F.2d 1573, 1581 (9th Cir. 1990) (internal quotes omitted); *see United States v. Doe*, 655 F.2d 920, 926 (9th Cir. 1980) ("The defendant must demonstrate that a joint trial is 'so manifestly prejudicial that it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion to sever.'"); *United States v. Douglass*, 780 F.2d 1472, 1478 (9th Cir. 1986) (noting, in discussing the burden to show prejudice, that "this burden is a difficult one to carry"); *United States v. Vasquez-Velasco*, 15 F.3d 833, 845 (9th Cir. 1994) ("Rule 14 sets a high standard for a showing of prejudice."). A showing "that a separate trial might offer a defendant a better chance of acquittal" is not sufficient to grant a motion to sever. *United States v. Lutz*, 621 F.2d 940, 945 (9th Cir. 1980) (quoting *Brady*, 579 F.2d at 1127-28). Defendant must show that trial of all counts together would render his trial "fundamentally unfair." *Bean v. Calderon*, 163 F.3d 1073, 1084 (9th Cir. 1998).

When, as here, the jury will be instructed to consider the evidence as to separate counts, "the ultimate question is whether, under all of the circumstances, it is within the capacity of the jurors to follow the court's admonitory instructions.'" *Brady*, 579 F.2d at 1128*; see also United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1980) ("The prime consideration in assessing the prejudicial effect of a joint trial is whether the jury can reasonably be expected to compartmentalize the evidence."). Courts in the Ninth Circuit assume that jurors listen to and follow a trial judge's instructions. *Escalante*, 637 F.2d at 1202. Any risk of prejudice that may arise from asking the jury to consider multiple charges "is of the type that can be cured with proper instructions." *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993).

The Court will instruct the jury appropriately in this case, and the Court cannot conclude that the jury will be unable to follow the instructions. Defendant has not shown that a trial of all counts would result in clear, manifest, or undue prejudice, or that failure to sever would deny him due process. The motion to sever will therefore

be denied.

**IT IS ORDERED:**

1. The motion to suppress (Doc. 300) is **denied**.
2. The motion in limine (Doc. 268) is **granted** with respect to the third firearm and otherwise **denied**.
3. The motion for a bill of particulars (Doc. 299) is **denied**.
4. The motion to sever (Doc. 253) is **denied**.

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 8/2/2013.

Dated this 9th day of December, 2013.

_____
David G. Campbell
United States District Judge